**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CLASSIC BUSINESS CORPORATION,<br>TAMON CORPORATION, and<br>VANDAN, LLC, | )<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    No. 09 C 7735 |
| | ) |
| EQUILON ENTERPRISES, LLC,<br>d/b/a Shell Oil Products US, | )<br>) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the court are two motions: (1) defendant's motion to dismiss Counts IV and V of the first amended complaint; and (2) plaintiffs' motion to dismiss the second amended counterclaim and third-party claim.  For the following reasons, defendant's motion is granted, and plaintiffs' motion is denied.

## BACKGROUND

Plaintiffs, Classic Business Corporation ("Classic"), Tamon Corporation ("Tamon"), and Vandan, LLC ("Vandan"), operate retail gasoline stations in the Chicagoland area.[1]  Each plaintiff sold Shell brand gasoline pursuant to a Retail Sales Agreement ("RSA") with defendant Equilon Enterprises, LLC, which does business as

---

[1]  Classic's station is in Chicago Ridge; Tamon's station is in Joliet; and Vandan's station is in Romeoville.

Shell Oil Products US ("Shell").  In the Shell distribution system, dealers such as plaintiffs who own the real property upon which they operate their gas stations (instead of leasing the property from Shell) are known as "open dealers."  In Chicagoland, there are relatively few open dealers.

Each plaintiff purchased its gas station from a Shell dealer and assumed the RSA that the dealer had entered into with Shell. Each RSA provides that it expires in 2016.  Regarding fuel pricing, Classic's RSA (referring to Classic as "Retailer" and Shell as "Seller") provides in pertinent part:

> Retailer shall pay Seller for the Products [sic] the price in effect at the time loading commences at the Plant for the place of delivery.  Retailer may ascertain Seller's current prices from Seller's computer based website or at such other place designated by Seller. Retailer acknowledges that Retailer is free to set the retail price for the Products.

(First Am. Compl., Ex. 1, ¶ 3(a).)  "Plant" is defined as "[t]he distributing plant from which deliveries of Products are made to Retailer."  (First Am. Compl., Ex. 1, ¶ 1(f).)  In the industry, the "plant" is also referred to as the "rack."  (First Am. Compl. ¶ 30.)  Tamon and Vandan's RSAs contain a similar provision:

> Retailer shall pay Seller for the Products [sic] the price in effect at the time loading commences at the Plant for the place of delivery.  Retailer may ascertain Seller's current prices at Seller's offices or at such other place designated by Seller.

(First Am. Compl. Exs. 2 & 3, ¶ 3(a).)  Plaintiffs refer to this type of pricing methodology as the "open price term" or the "dealer tank wagon" price.  (First Am. Compl. ¶ 30.)

According to plaintiffs, at some point after they assumed the RSAs from the former Shell dealers, Shell changed its marketing and distribution system in the Chicagoland area.  Instead of selling fuel directly to retailers, Shell began selling through a series of "jobbers," or authorized wholesale distributors.  Shell also changed its pricing method, and instead of using a "breakeven calculator" based upon a stated gross margin guarantee of ten cents per gallon for plaintiffs, it now "unilaterally" sets prices without regard to the previous method.  (First Am. Compl. ¶¶ 47, 49.)  In response to plaintiffs' inquiries, Shell stated that it was setting the prices with respect to the "market as a whole," but refused to explain further.  (First Am. Compl. ¶ 50.)  It is alleged that Shell now charges jobbers and non-open dealers less for fuel from the same "rack" (and less for delivery) than open dealers such as plaintiffs.

Plaintiffs contend that by changing its pricing methodology, Shell violated its duty to set fuel prices in good faith and materially breached the RSAs.  Plaintiffs allege that they are now at a competitive disadvantage and that they have lost sales and customers.  They also allege on information and belief that Shell is attempting to drive them "out of business so that Shell can

reacquire the Plaintiffs' Facilities from the Plaintiffs at greatly reduced prices and in turn resell these Facilities and the real property to a jobber/distributor at a significant profit." (First Am. Compl. ¶ 57.)

The First Amended Complaint contains five counts. Count I alleges price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13. In Count II, plaintiffs allege that Shell breached the RSAs and violated the Illinois Commercial Code, 810 ILCS 5/2-305, by "unilaterally and unreasonably raising fuel prices charged to the Plaintiffs in bad faith calculated without reference to any good faith market rate formula or legitimate regional policy but instead to Shell's objective of terminating certain dealerships." (First Am. Compl. ¶ 81.) Count III is a breach of contract claim for invoicing plaintiffs for more fuel than was actually delivered to them. In Count IV, plaintiffs allege that Shell violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 et seq. (the "CFDBPA"). In Count V, plaintiffs seek a declaratory judgment pursuant to the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701.

Shell has filed a two-count counterclaim against Classic and a third-party claim against Classic Wise Investments, Inc. ("Classic Wise"), which is affiliated with Classic and owns the real property at the Chicago Ridge gas station. The counterclaim is discussed in more detail in Part B, below.

Shell moves to dismiss Counts IV and V of the complaint. Classic and Classic Wise move to dismiss the counterclaim and third-party claim.

## DISCUSSION

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). Under federal notice-pleading standards, a complaint need not contain "detailed factual allegations," but it must have more than mere "labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff is obligated to provide the factual grounds of his entitlement to relief, and a "formulaic recitation" of the elements of a claim will not do. Id. The complaint must contain sufficient facts to raise a plaintiff's right to relief above a "speculative" level, id. at 555, and the claim must be "plausible on its face," id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint, but not its legal conclusions. Id. at 1949-50.

## A.  Defendant's Motion to Dismiss Counts IV and V

### 1.  Statutory Fraud (Count IV)

Count IV is plaintiffs' CFDBPA claim.  The practices alleged to have violated the statute are "Shell's unlawful acts of charging the Plaintiffs for fuel that Shell never delivered to the Plaintiffs, manipulating the price of the fuel that Shell charged to the Plaintiffs, [and] changing the methods by which Shell set the price for fuel."  (First Am. Compl. ¶ 93.)[2]

The elements of a CFDBPA claim are a deceptive act or practice by the defendant; the defendant's intent that the plaintiff rely on the deception; and the occurrence of the deception during a course of conduct involving trade or commerce.  Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002).  Recovery may be had for unfair conduct as well.  Id.  "[W]here the dispute involves two businesses who are not consumers, the proper test is . . . whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns."  Downers Grove Volkswagen, Inc. v. Wigglesworth Imps., Inc., 546 N.E.2d 33, 41 (Ill. App. Ct. 1989); see also Athey Prods. Corp. v. Harris Bank Roselle, 89 F.3d 430, 436-37 (7th Cir. 1996).  Shell argues that Count IV should be dismissed because plaintiffs have failed to satisfy this "consumer nexus" requirement.

_____

[2]  Plaintiffs also toss in the phrase "and other deceptive acts and practices," but this phrase is far too conclusory to give fair notice of any other grounds on which the claim rests.

Plaintiffs, as resellers of Shell's gasoline, are not acting as consumers, and Shell asserts that they have not pled conduct addressed to the market generally or implicating consumer-protection concerns. In response, plaintiffs first point to their allegation that Shell's conduct was "directed toward" other similarly-situated open dealers. But allegedly charging higher prices to "relatively few" (in plaintiffs' words) open dealers in the Chicagoland area is not equivalent to a trade practice addressed to the market generally. Plaintiffs contend that they have also adequately alleged conduct that implicates consumer-protection concerns because their customers "may eventually incur the additional costs of fuel being charged to Plaintiffs." (Pls.' Resp. at 8.) Courts in this district have held that the product's ultimate sale to consumers, however, is not a sufficient consumer nexus, as discussed in Pressalite Corp. v. Matsushita Elec. Corp. of Am., No. 02 C 7086, 2003 WL 1811530 (N.D. Ill. Apr. 4, 2003):

> "Courts have consistently resisted attempts by plaintiffs to portray otherwise ordinary breach of contract claims as causes of action under the Illinois Consumer Fraud Act." 188 LLC [v. Trinity Indus., Inc., No. 00 C 7993,] 2001 WL 506891, at *2 [(N.D. Ill. May 14, 2001)]. While "[a]lmost every product or service sold by one commercial party to another will ultimately affect a consumer . . . the act does not apply to all commercial transactions." Id. at *3. Thus "to state a cause of action under the Act, something more must be alleged than a mere effect on consumers." Id.; see Williams Electronic Games Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619 at *10 (N.D. Ill. Sept. 18, 2001) (Gettleman, J.) ("The mere fact that plaintiff's product may ultimately be sold to a consumer is too attenuated."); see Simon v. Oltmann, No. 98 C 1759, 2001 WL 1035719 at *8 (N.D. Ill. Aug. 21, 2001)

- 8 -

(Leinenweber, J.) ("Courts have struggled to define the
scope of ... [consumer protection concerns] but it
generally involves sharp practices designed to mislead
consumers about a competitor ... or public health, safety
or welfare issues.").  Pressalite fails to identify a
nexus other than the ultimate sale of its flashlights to
consumers and thus fails to state a claim under the Act.

Id. at *10; see also Stepan Co. v. Winter Panel Corp., 948 F. Supp.

802, 806-07 (N.D. Ill. 1996) (rejecting argument that

misrepresentation affected consumers because consumers ultimately

used the product).  The complaint does not actually contain an

allegation that consumers "may eventually" pay higher prices for

fuel at plaintiffs' stations than at other stations, but even if it

did, it would be too attenuated, not to mention speculative, to

constitute a consumer nexus under the Act.

We are similarly unpersuaded by plaintiffs' argument that

Shell's alleged "attempt to eliminate the competition in the area"

triggers consumer-protection concerns.  (Pls.' Resp. at 8.)  Absent

deception of consumers, or an implication of public health, safety,

or welfare issues, a competitive injury to plaintiffs does not

satisfy the consumer-nexus requirement.  See, e.g., Downers Grove

Volkswagen, 546 N.E.2d at 40 (businesses have standing to sue under

the statute to redress competitive injury they suffer when other

businesses deceive consumers); Greenpoint Mortg. Funding. Inc. v.

Family First Mortg., Inc., No. 05 C 4498, 2007 WL 2608554, at *5-6

(N.D. Ill. Sept. 4, 2007).  We are unable to reasonably infer from

the allegations that consumers were harmed in any way.

We agree with Shell that plaintiffs' statutory fraud claim is simply a restatement of their claims for breach of contract. A contractual claim, without more, is not actionable under the CFDBPA. The Illinois Supreme Court has held that a defendant's repeated failures to fulfill contractual promises made to certain consumers were not actionable under the CFDBPA, explaining as follows:

> A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act. . . . What plaintiff calls "consumer fraud" or "deception" is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. We believe that a "deceptive act or practice" involves more than the mere fact that a defendant promised something and then failed to do it. That type of "misrepresentation" occurs every time a defendant breaches a contract.

Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801, 844 (Ill. 2005) (internal citations and quotation marks omitted). Plaintiffs contend that Shell's alleged plan to drive them out of business is more than a mere breach of contract, but this invocation of a "plan" adds nothing of substance to Count IV. The *conduct* on which the statutory fraud claim is based is identical to the conduct on which the contract claim in Count II is based: unreasonably raising prices in violation of the duty of good faith implicit in the RSAs.

Because Count IV is duplicative of the breach of contract claim in Count II and fails to allege a consumer nexus, and we see no prospect of successful amendment in this regard, it will be dismissed with prejudice. We need not address Shell's remaining argument (pursuant to Rule 9(b)) for dismissal of Count IV.

**2. <u>Declaratory Judgment (Count V)</u>**

In Count V, plaintiffs seek a declaration pursuant to the Illinois Declaratory Judgment Act, 735 ILCS 5/2-701, that "(1) Plaintiffs are no longer required to purchase all of their fuel from Shell, (2) Plaintiffs are not liable to pay Shell any early termination fees or penalties; (3) Plaintiffs may terminate the RSAs without triggering any deed covenants and/or restrictions, (4) such other declarations of the rights of the plaintiffs as this Court deems just." (First Am. Compl. ¶ 100.)

As an initial matter, federal law, not state law, determines whether we can grant a declaratory judgment, so the Illinois Declaratory Judgment Act is inapplicable. <u>Brodsky v. L & R Autobody Specialists, Inc.</u>, No. 88 C 6657, 1989 WL 84569, at *1 (N.D. Ill. July 24, 1989) (Grady, J.). As Shell points out, the federal Declaratory Judgment Act governs plaintiffs' claim. <u>See Household Fin. Servs., Inc. v. Northern Trade Mortg. Corp.</u>, No. 99 C 2840, 1999 WL 782072, at *2 (N.D. Ill. Sept. 27, 1999).

The purpose of the Declaratory Judgment Act is "to avoid accrual of avoidable damages to one not certain of his rights and

to afford him an early adjudication, without waiting until his adversary should see fit to begin suit, after damage had accrued." NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V., 28 F.3d 572, 577 (7th Cir. 1994).  Where a claim for declaratory judgment presents the same issues as the remaining substantive claims, it serves no useful purpose and should be dismissed. Vulcan Golf, LLC v. Google Inc., 552 F. Supp. 2d 752, 778 (N.D. Ill. 2008); Amari v. Radio Spirits, Inc., 219 F. Supp. 2d 942, 944 (N.D. Ill. 2002).

Shell asserts that Count V is duplicative of plaintiffs' contract claims and serves no useful purpose.  Plaintiffs argue that they have simply requested a declaration of their own rights, but they fail to address the matter of redundancy.  Although the relief sought is packaged as a declaration of *plaintiffs'* duties, it is premised on an allegation that *Shell* breached the RSAs by imposing the price increases, First Am. Compl. ¶ 98, and would require such a finding.  Because the complaint already contains a breach of contract claim based on the price increases, the relief sought in Count V serves no useful purpose.  Accordingly, Count V will be dismissed with prejudice.

**B.  Classic and Classic Wise's Motion to Dismiss the Counterclaim and Third-Party Claim**

In Count I of its counterclaim, Shell alleges that Classic and Classic Wise (the "Classic entities") breached a "brand covenant,"

- 12 -

a deed restriction that runs with the land on which the Chicago Ridge station operates, by selling non-Shell gasoline at the station after terminating the RSA. Shell seeks an injunction prohibiting the Classic entities from selling fuel on at the Chicago Ridge station unless it is purchased from Shell or its successor and from otherwise breaching the restrictive covenant. In Count II, Shell alleges that Classic breached the RSA by terminating the contract before the expiration of its term and before purchasing the required minimum fuel quantities and by failing to pay the liquidated damages specified in the contract. It seeks damages of "at least" $73,744.90, plus interest, attorney's fees, and costs. (Second Am. Countercl. at 12.)

The Classic entities first contend that Shell lacks standing to bring the claims and has pleaded itself out of court because Shell "alleges that there has been some assignment of the rights under the RSA and/or the deed covenant to True North Energy, LLC." (Classic Entities' Mem. at 4.) This argument mischaracterizes the allegations. Shell alleges that it entered into an agreement with True North Energy LLC ("True North") to "sell its interests in a number of retail motor fuel stations and certain retail supply agreements in the Chicago area." (Second Am. Countercl. ¶ 27.) It alleges that Classic terminated the RSA on February 21, 2010 and that the True North transaction closed on March 8, 2010. Shell also alleges that it gave True North the right to distribute Shell

fuel to the Chicago Ridge station.  It does not, however, allege that it assigned its interests in either the brand covenant or the Classic RSA to True North.  The Classic entities might raise the purported assignment as a defense, but Shell has not pleaded itself out of court.

The Classic entities next assert that Shell fails to state a claim for injunctive relief for breach of the brand covenant because the liquidated damages clause of the RSA "fully compensates" Shell for any violation of the brand covenant. (Classic Entities' Mem. at 6.)  This argument misses the mark. Count I arises out of the restrictive covenant, which is a part of a special warranty deed.  The deed creates rights and obligations separate from the RSA, and therefore the liquidated damages provision of the RSA has no bearing on the remedy for violation of the brand covenant.  The fact that the restrictive covenant refers generally to RSAs and requires that the premises be operated pursuant to the terms of the "standard Supply Agreement" does not change its separate nature.  The Classic entities' variations on the same argument--Shell admits there is no irreparable harm, it has elected its remedy, it has pleaded itself out of a claim--are likewise rejected.  Moreover, the argument that Shell "admits" it prevented Classic from complying with the brand covenant is rejected.  Shell admits no such thing in the counterclaim.

The Classic entities contend that we should dismiss Count II, Shell's claim for breach of the RSA, for two reasons.  The first is that Shell has failed to allege that it fully performed under the terms of the RSA.  We disagree; we can reasonably infer from Shell's allegations that it performed its contractual obligations. The Classic entities' second contention is that "[i]t cannot be that the contract was allegedly breached by Classic when it chose to exercise its right to early termination because the contract itself provides for such a right."  (Classic Entities' Mem. at 12.) In support of this argument, they (selectively) cite the liquidated damages provision of the RSA, which states in relevant part:

> The parties agree that in the event of the termination of
> this Agreement (whether due to Seller's termination for
> cause or Retailer's termination) prior to Retailer
> purchasing the total Minimum Quantities required to be
> purchased over the term of this Agreement, Seller will be
> damaged and entitled to compensation for such damages,
> which will be extremely difficult and impracticable to
> determine.  Further, both parties wish to avoid the time
> and expense of protracted litigation that would result if
> Seller filed a lawsuit to collect its damages for breach
> of this Agreement.

(First Am. Compl., Ex. 1, ¶ 2(b).)  According to the Classic entities, early termination did not constitute a breach because the RSA "provides for the potential of early termination."  (Classic Entities' Mem. at 11.)  This argument is meritless.  The liquidated damages provision anticipates the possibility of the retailer's early termination but does not sanction it; rather, the provision

impliedly recognizes early termination as a breach and specifies a penalty.

**CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss Counts IV and V of the first amended complaint [32] is granted, and those claims are dismissed with prejudice.  The motion of Classic Business Corporation and Classic Wise Investments [55] to dismiss the second amended counterclaim and third-party claim is denied.

A status hearing is set for February 9, 2011 at 11:00 a.m. to discuss discovery.


DATE:          January 27, 2011



ENTER:        _____

               John F. Grady, United States District Judge